**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 21-5203**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

VALANCOURT BOOKS, LLC,

Plaintiff-Appellant,

v.

MERRICK B. GARLAND, *Attorney General*; SHIRA PERLMUTTER, *in her official capacity as Register of Copyrights for the U.S. Copyright Office*,

Defendants-Appellees.

_____

**BRIEF OF *AMICI CURIAE* AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF RESEARCH LIBRARIES, ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

_____

On Appeal from the U.S. District Court for the District of Columbia
Case No. 1:18-cv-01922-ABJ
Hon. Amy Berman Jackson

_____

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

Erik Stallman
Samuelson Law, Technology
  & Public Policy Clinic
UC Berkeley School of Law
587 Simon Hall
Berkeley, CA 94702
(510) 642-2485
estallman@clinical.law.berkeley.edu

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Counsel for amici curiae certify as follows:

(A)    Parties and amici:

All parties, intervenors, and *amici* appearing in the proceedings below are listed in the Brief of Appellants.

(B)    Rulings under review:

References to the rulings under review appear in the Brief of Appellants.

(C)    Related cases:

*Amici* are unaware of any related cases.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to D.C. Circuit Rule 26.1, the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries (*amici* library associations) state that they have no parent corporations and that no publicly held corporation or other publicly held entity owns ten percent (10%) or more of any *amicus* library association.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................v

GLOSSARY OF ABBREVIATIONS.......................................x

STATUTES AND REGULATIONS .......................................x

STATEMENT OF IDENTITY AND INTEREST OF AMICI ................1

SUMMARY OF ARGUMENT................................................2

ARGUMENT .................................................................4

I.   The Deposit Requirement Is a Valid Condition on a Statutory Right Because It Helps Fulfill the Essential Bargain of Copyright. .........................................4

     A.   The Deposit Requirement Is Part of the *Quid Pro Quo* of Copyright Protection. ..............................................5

     B.   The Deposit Requirement and the Library of Congress Have Become More Essential to Fulfilling the Purpose of Copyright Over Time. ........7

II.  The Deposit Requirement Ensures Preservation of and Access to Significant Works at Risk of Disappearance........................................11

     A.   Works Deposited Under § 407 Support a Comprehensive and Diverse National Collection. ..........................................12

     B.   The Library of Congress's Preservation Efforts Allow the Public to Access Works After Rightsholders Lose Their Incentive to Provide Them. .................................................14

     C.   Access to Deposited Works Expands the Store of Public Knowledge and Leads to the Creation of New Works............................19

III. Costs Imposed by § 407 Are Minor Compared to the Benefits That Rightsholders Receive From the Copyright System.......................................21

     A.   The Burdens of § 407 Have Been Overstated........................21

     B.   Rightsholders Benefit From Copyright Protection and Enforcement Even Without Registering Their Works. ...............................24

     C.   Authors and Publishers Benefit From Library Deposits........................25

CONCLUSION ...............................................................27

CERTIFICATE OF COMPLIANCE .......................................................28

CERTIFICATE OF SERVICE..............................................................29

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ................................................................... 6

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................ 17

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ....................................... 7

*Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498 (2020) ............................ 24

*Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) ....................................... 6

*Ladd v. L. & Tech. Press.*, 762 F.2d 809 (9th Cir. 1985) ................................... 7, 10

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................................ 5

*Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984) ......................... 5

*Stewart v. Abend*, 495 U.S. 207 (1990) .................................................... 4

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) ....................................... 6

## FEDERAL LAWS AND STATUTES

15 U.S.C. § 8111 ................................................................................. 24

17 U.S.C. § 107 ................................................................................... 7

17 U.S.C. § 1201 ................................................................................. 25

17 U.S.C. § 407(c) ............................................................................ 21, 22

17 U.S.C. § 512(c) ............................................................................... 25

18 U.S.C. § 2319(c) ............................................................................. 24

An Act to Establish the "Smithsonian Institution," for the Increase and Diffusion of Knowledge Among Men, 9 Stat. 102 (1846)....................................................... 8

The Copyright Act of 1710 (the Statute of Anne), 8 Ann. c. 19. (1710) (Gr. Brit.) 7, 8

**REGULATIONS**

37 C.F.R. § 202.19(b)(4) ......................................................................... 22

37 C.F.R. § 202.19(c) ............................................................................... 22

37 C.F.R. § 202.19(e) ............................................................................... 23

37 C.F.R. § 202.24 .................................................................................... 11

37 C.F.R. § 202.24(d) ............................................................................... 22

37 C.F.R. §§ 202.19(c)(5) ........................................................................ 22

Mandatory Deposit of Published Electronic Works Available Only Online, 75 Fed. Reg. 3863 (Jan. 25, 2010) .................................................................. 11

**LEGISLATIVE MATERIALS**

An Act for the Purpose of Securing to Authors the Exclusive Right and Benefit of Publishing Their Literary Productions for Twenty-One Years, in *The Perpetual Laws of the Commonwealth of Mass.* (Adams and Nourse, 1789), https://www.copyrighthistory.org/cam/tools/request/showRepresentation.php?id=representation_us_1783d [https://perma.cc/273W-6NF6] ................................. 8

Elizabeth K. Dunne, *Study No. 20: Deposit of Copyrighted Works, in* Copyright Law Revision Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Comm. On the Judiciary, 86th Cong., 2d Sess. (Comm. Print 1960).............................................................................................................. 5

Fourth Annual Report of the Board of Regents of the Smithsonian Institution, Sen. Misc. Rep. No. 120, 31st Cong., 1st Sess. (1850) ................................................. 9

S. Rep. No. 100-352 (1988)................................................................. 5, 10

**ADMINISTRATIVE MATERIALS**

Libr. of Cong., *Annual Report of the Librarian of Congress for the Fiscal Year Ending Sept. 30, 2020* (2020), https://www.loc.gov/static/portals/about/reports-

and-budgets/documents/annual-reports/fy2020.pdf [https://perma.cc/F77K-PPKP] .................................................................................... 11, 20

Libr. of Cong., *Annual Report of the Librarian of Congress for the Fiscal Year Ending September 30, 2019* (2019), https://www.loc.gov/static/portals/about/reports-and-budgets/documents/annual-reports/fy2019.pdf ........................................................... 20

Libr. of Cong., *Fiscal 2021 Budget Justification* (2020) ...................................... 18

Libr. of Cong., *Fiscal 2022 Budget Justification* (2021) ...................................... 18

Robert Wedgeworth & Barbara Ringer, *Advisory Committee on Copyright Registration and Deposit: Report of The Co-Chairs* (1993) .... 10, 11, 12, 13, 19, 23, 24, 25

The Section 108 Study Group Report, U.S. Copyright Office, Mar. 2008, https://www.section108.gov/docs/Sec108StudyGroupReport.pdf .................... 21

## OTHER AUTHORITIES

*A Study of the Current State of American Film Preservation: Volume 1,* Libr. of Cong. (June 1993), https://www.loc.gov/programs/national-film-preservation-board/preservation-research/film-preservation-study/current-state-of-american-film-preservation-study/ [https://perma.cc/9LKQ-S4FV] .................................. 17

Craig Joyce, *"A Curious Chapter in the History of Judicature": Wheaton v. Peters and the Rest of the Story (of Copyright in the New Republic)*, 42 Hous. L. Rev. 325 (2005) ........................................................................................................... 8

Daniel J. Boorstin, *The Indivisible World: Libraries and the Myth of Cultural Exchange*, in *Center for the Book Viewpoint Series No. 15* (1985) .................. 12

Ed Yong, *What Was Lost in Brazil's Devastating Museum Fire,* The Atlantic (Sept. 4, 2018), https://www.theatlantic.com/science/archive/2018/09/brazil-rio-de-janeiro-museum-fire/569299/ [https://perma.cc/4LYM-LJLZ] ......................... 15

Ellen C. Dement, *The Making of a National Library*, 2 Vand. Hist. Rev. 74. (2017) ................................................................................................................. 9

Gen. Info. Programme and UNISIST, *Lost Memory – Libraries and Archives Destroyed in the Twentieth Century,* UNESCO CII-96/WS/1 (Mar. 1996) ....... 16

Jody Rosen, *The Day the Music Burned*, N.Y. Times (June 11, 2019), https://www.nytimes.com/2019/06/11/magazine/universal-fire-master-recordings.html [https://perma.cc/3HXN-6RE3] ......................................... 16, 17

John Y. Cole, *America's Greatest Library: An Illustrated History of the Library of Congress* (GILES 2017) ..................................................................................... 9

Kenneth E. Harris & Susan E. Schur, *A Brief History of Preservation and Conservation at the Library of Congress* (Oct. 2006), https://www.loc.gov/preservation/about/history/pres-hist.pdf .......................... 18

*LC Lowers Age of Users for Main Reading Room*, 19 Libr. of Cong. Gazette 1 (May 2, 2008) ............................................................................................... 19

Libr. of Cong., *Introduction to Collections Policy Statements*, https://www.loc.gov/acq/devpol/cps.html [https://perma.cc/2YCN-MQAJ] ..... 13

Libr. of Cong., *Library of Congress Collections Policy Statements: Ethnic Materials—United States* (Updated Apr. 2022), https://www.loc.gov/acq/devpol/ethnic.pdf [https://perma.cc/RGS9-FVHH] ... 14

Libr. of Cong., *Library of Congress Collections Policy Statements: LGBTQIA+ Studies* (Rev. Mar. 2022), https://www.loc.gov/acq/devpol/lgbtqia.pdf [https://perma.cc/MQ6C-TH97] ......................................................................... 14

Libr. of Cong., *Library of Congress Collections Policy Statements: Literature and Language* (Rev. Mar. 2022), https://www.loc.gov/acq/devpol/litlang.pdf [https://perma.cc/Z9QX-3YMB] ............................................................ 12, 13, 14

Libr. of Cong., *Library of Congress Collections Policy Statements: Women's and Gender Studies* (Rev. Apr. 2022), https://www.loc.gov/acq/devpol/wgs.pdf [https://perma.cc/FMU9-KSJ4] ......................................................................... 14

Mike Casey, *Why Media Preservation Can't Wait: The Gathering Storm*, 44 Int'l Ass'n of Sound and Audiovisual Archives J. 14 (2015) ..................................... 16

Nora McGreevy, *Why the Cape Town Fire Is a Devastating Loss for South African Cultural Heritage,* Smithsonian Mag. (Apr. 20, 2021),

https://www.smithsonianmag.com/smart-news/cultural-heritage-historic-library-destroyed-south-africa-blaze-180977539/ [https://perma.cc/XC6Y-2QA5] ...... 15

*Our History*, Valancourt Books, https://www.valancourtbooks.com/our-history.html [https://perma.cc/CHP6-JPEE] ........................................................ 26

*Overview*, The Nat'l Libr. Service for the Blind and Print Disabled (2020), https://www.loc.gov/nls/about/overview/ [https://perma.cc/J7Y3-VCAZ] ........ 20

Parul Zaveri, *Damage to Libraries Due to Water Related Disasters, Library Philosophy and Practice,* Libr. Phil. Prac., Aug. 2014 ..................................... 16

Pranshu Verma, *Meet the 1,300 Librarians Racing to Back Up Ukraine's Digital Archives,* Wash. Post (Apr. 8, 2022), https://www.washingtonpost.com/technology/2022/04/08/ukraine-digital-history/ [https://perma.cc/6HNJ-AL3Y] ............................................................ 15

*Request Items Through Interlibrary Loan*, 5 Libr. of Cong. Mag. 6 (2016) .......... 20

William F. Patry, 3 Patry on Copyright (2022) ....................................................... 17

Zechariah Chafee, Jr., *Reflections on Copyright: I*, 45 Colum. L. Rev. 503 (1945) ................................................................................................................... 25

## GLOSSARY OF ABBREVIATIONS

**ACCORD:** Advisory Committee on Copyright Registration and Deposit

**ACCORD Report:** Robert Wedgeworth & Barbara Ringer, *Advisory Committee on Copyright Registration and Deposit: Report of the Co-Chairs* (1993)

**Berne Convention:** The Berne Convention for the Protection of Literary and Artistic Works

**The Library:** The Library of Congress

**Valancourt:** Valancourt Books, LLC

## STATUTES AND REGULATIONS

Except for 37 C.F.R. § 202.19, all pertinent statutes and regulations are contained in the Brief of Plaintiff-Appellant.

## STATEMENT OF IDENTITY AND INTEREST OF AMICI[1]

The American Library Association ("ALA"), established in 1876, is a non-profit professional organization of more than 57,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries ("ARL") is an association of 126 research libraries in North America. ARL's members include university libraries, public libraries, and government and national libraries. ARL programs and services

---

[1] In accordance with Federal Rule of Appellate Procedure 29, no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing and submitting the brief. Fed. R. App. P. 29(a)(4)(E). The Library of Congress is a member of the Association of Research Libraries. The Library of Congress did not contribute any funds specific to the preparation or submission of this brief, or provide assistance in that regard. All parties have consented to the filing of this *amicus* brief. Counsel for *amici* are not aware of any other *amicus* brief to be filed in support of Defendants-Appellees.

1

promote equitable access to and effective use of recorded knowledge in support of teaching and research.

Collectively, these three library associations (*amici* library associations) represent over 117,000 libraries in the United States.

The *amici* library associations submit this brief because of the importance of the deposit requirement to accomplishing their member libraries' mission to collect and preserve works embodying our cultural heritage. Deposit is essential in supporting the efforts of the Library of Congress to provide public access to a comprehensive national collection. The Library participates in many programs that ensure that library users throughout the country have access to those works, both during and after copyright owners' period of exclusivity. That public access is part of the essential bargain struck by our copyright laws and the mission of the *amici* library associations and their member libraries.

## SUMMARY OF ARGUMENT

Understanding the § 407 deposit requirement's relationship to our copyright system turns on understanding the role the Library of Congress plays in that system. The purpose of this brief is to explain that role and the function of the § 407 deposit requirement in fulfilling it.

A fundamental part of the *quid pro quo* of our copyright system is a temporary and federally enforced period of exclusivity for copyright owners—with appropriate

2

limitations and exceptions—in exchange for public access to creative works after the period of exclusivity. Congress included the § 407 deposit requirement to help effectuate that bargain by channeling significant published works into the Library's national collection. Congress's decision enjoys substantial deference under our copyright precedent. It is also rationally related to a legitimate government interest and the conferral of a statutory benefit under our Takings Clause jurisprudence. Cases regarding personal property are inapposite because copyright interests are not common-law property rights.

The deposit requirement's connection to the purpose of copyright has only strengthened over time. With the birth of the Library of Congress, the deposit requirement has served to preserve works in a national collection available to the public both during and after the term of copyright protection. It is unsurprising that Congress chose to retain the requirement even after dispensing with formalities to conform the Copyright Act to the Berne Convention.

Section 407 deposit allows the Library and the Copyright Office to ensure that significant works enter the national collection regardless of registration status, popularity, or commercial exploitation. This ability is particularly important as copyright terms now span longer than rightsholders' interests in preserving the works they own. Without the Library's extensive efforts to preserve deposit copies, works would be lost long before the period of exclusivity expires. As happened in

3

this case. The Library's efforts to put deposit copies into the hands of the public, regardless of their location or disability, similarly furthers the purpose of copyright.

Finally, the costs of complying with the deposit requirement are modest compared to the benefits rightsholders receive and a fair exchange for copyright's tax on readers. An assessment of those costs must include the flexibility § 407 affords the Copyright Office to ensure that the requirement does not impose undue burdens. It must also account for the full benefits that publishers like Valancourt Books receive from copyright, including the ability to exploit a rare public domain work that the publisher found in—of all places—a library.

## ARGUMENT

### I. The Deposit Requirement Is a Valid Condition on a Statutory Right Because It Helps Fulfill the Essential Bargain of Copyright.

The deposit requirement is foundational to U.S. copyright law and helps fulfill the constitutional purpose of copyright. Congress, through the Copyright Act, has "creat[ed] a balance between the artist's right to control the work during the term of copyright protection and the public's need for access to creative works." *Stewart v. Abend*, 495 U.S. 207, 228 (1990). The deposit requirement is an essential part of that balance because it ensures "public access to the products of [authors'] genius after the limited period of exclusive control has expired." *See Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 429 (1984). It is thus rationally related to a legitimate government interest and a valid condition on a statutory benefit.

4

While copyright law in the United States has changed significantly, library deposit has remained an important fixture. In 1846, through the Smithsonian Act, Congress formally initiated deposit for use in libraries in order to build a national collection. Elizabeth K. Dunne, *Study No. 20: Deposit of Copyrighted Works, in* Copyright Law Revision Studies Prepared for the Subcomm. o*n Patents, Trademarks, and Copyrights* of the Comm. On the Judiciary*,* 86th Cong., 2d Sess. (Comm. Print 1960), at 11–12. Even after the Berne Convention, Congress retained the deposit requirement for library use because it is a necessary tool in building a national collection. *See* S. Rep. No. 100-352 at 45 (1988). As the mission of the Library of Congress has evolved, the deposit requirement's connection to the core purpose of copyright has only strengthened.

## A. The Deposit Requirement Is Part of the *Quid Pro Quo* of Copyright Protection.

As the Court in *Monsanto* explained, Congress may condition voluntarily sought benefits on the furnishing of certain private property if that condition rationally relates to a legitimate government interest. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) (conditions on voluntarily sought government benefit (registration to sell pesticides) were "rationally related to a legitimate Government interest" and constitutional). Valancourt laid claim to that economic advantage when it affixed copyright notices and a warning to potential infringers of its works. JA 113.

Comparisons to the "basic and familiar use of property" at issue in *Horne* are improper. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015). Copyright is not a basic and familiar use of property. It has been clear since at least *Wheaton v. Peters* that copyright is not a common-law property right, and that Congress may prescribe the conditions under which it is enjoyed. *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663–64 (1834). Nor does the Copyright Act rest on "any natural right that the author has in his writings . . . but upon the ground that the welfare of the public will be served and progress of science and useful arts will be promoted by securing to authors for limited periods the exclusive rights to their writings." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 445 (D.C. Cir. 2018) (citing to H.R. Rep. No. 60-2222, at 7 (1909)). Far from a natural property right of authors, "the principle of copyright is a 'tax on readers for the purpose of giving a bounty to writers.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1195 (2021) (quoting Thomas Macaulay, *Speeches on Copyright* 25 (1913)). And Congress, "weighing advantages and disadvantages, will determine the more specific nature of the tax, its boundaries and conditions, the existence of exceptions and exemptions, all by exercising its own constitutional power to write a copyright statute." *Id*. at 1195–96.

Just as fair use is a valid limitation on the scope of exclusive rights conferred by the Copyright Act, the deposit requirement is a valid condition on the enjoyment

of those exclusive rights. *See* 17 U.S.C. § 107. This is true regardless of whether noncompliance with that condition results in forfeiture of the exclusive rights. Both fair use and the deposit requirement ensure that copyright "ultimately serves the purpose of enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). The § 407 deposit requirement accomplishes this objective by promoting public access to works both during and after the period of copyright exclusivity.

### B. The Deposit Requirement and the Library of Congress Have Become More Essential to Fulfilling the Purpose of Copyright Over Time.

The purpose of the deposit requirement has evolved over time. The most notable development in that evolution has been the creation of the Library of Congress and its public-facing mission. As the Ninth Circuit explained in *Ladd*, "[t]he Copyright Clause grants copyright protection for the purpose of promoting the public interest in the arts and sciences. Conditioning copyrights on a contribution to the Library of Congress furthers this overall purpose." *Ladd v. L. & Tech. Press.*, 762 F.2d 809, 814 (9th Cir. 1985). Although the failure to deposit works with the Library is no longer grounds for forfeiture, the connection between the § 407 deposit requirement and the purpose of copyright persists.

The deposit requirement finds a precursor in the Statute of Anne. The Copyright Act of 1710 (the Statute of Anne), 8 Ann. c. 19. (1710) (Gr. Brit.). The Statute required nine copies of each published work to be deposited for distribution

to prominent libraries such as the Bodleian at Oxford University. *Id.* art. V. Massachusetts' 1783 copyright statute similarly provided that one copy of every copyrighted book be forwarded "to the library of the university at *Cambridge* [Harvard], for the use of said university." An Act for the Purpose of Securing to Authors the Exclusive Right and Benefit of Publishing Their Literary Productions for Twenty-One Years, in *The Perpetual Laws of the Commonwealth of Mass.* 369– 70 (Adams and Nourse, 1789).[2] The first federal copyright law, the Copyright Act of 1790, contained a deposit requirement to the office of the Secretary of State, which appears unrelated to access and preservation. Craig Joyce, *"A Curious Chapter in the History of Judicature": Wheaton v. Peters and the Rest of the Story (of Copyright in the New Republic)*, 42 Hous. L. Rev. 325, 361 (2005).

The Smithsonian Institution Act of 1846, however, established a direct connection between deposit and the building of a national collection. The Act provided that one copy of each work should be delivered to the Librarian of the Smithsonian Institution and to the Librarian of Congress within three months after publication to build a national library. An Act to Establish the "Smithsonian Institution," for the Increase and Diffusion of Knowledge Among Men, 9 Stat. 102, 106 (1846). Charles Jewett, the librarian appointed to the Smithsonian, stressed the

---

[2] For authorities available on the internet, URLs appear in the Table of Authorities. All sites were last visited on June 1, 2022.

importance of the deposit requirement in building a national library: "[t]o the public, the importance, immediate and prospective, of having a central depot, where all the products of the American press may be gathered, year by year, and preserved for reference, is very great." Fourth Annual Report of the Board of Regents of the Smithsonian Institution, Sen. Misc. Rep. No. 120, 31st Cong., 1st Sess. at 35 (1850).

In an effort to centralize copyright registration and deposit, the Copyright Act of 1870 transferred all deposits to the Library of Congress. John Y. Cole, *America's Greatest Library: An Illustrated History of the Library of Congress* 42 (GILES 2017). Originally built as a reference library for members of Congress, the Library has expanded to become a key resource for the American public. Ellen C. Dement, *The Making of a National Library*, 2 Vand. Hist. Rev. 74 (2017).

While eliminating copyright formalities, the Berne Convention left room for member countries to request deposit copies and to impose fines for failure to comply. Jane C. Ginsburg, *The U.S. Experience with Formalities: A Love/Hate Relationship*, 33 Columbia J. L. & Arts 311, 316 (2010). When implementing Berne, the Senate Committee on the Judiciary recognized that deposits under § 407 worked to advance the purposes of the Copyright Clause of the Constitution. S. Rep. No. 100-352, at 45 (1988). The Committee reasoned that, even though deposit would no longer be a condition of copyright protection, it remained "an element of the 'quid pro quo' paid by authors and copyright owners for the benefits they enjoy as copyright

9

proprietors." *Id.* The Committee also emphasized that the expansion of the deposit requirement to include works that were published without copyright notice "further underscores the importance of the requirement, and should enhance the usefulness of this means of acquisition by the Library of Congress of works for its collections." *Id.* Nothing about changes to U.S. copyright law to implement the Berne Convention disturbs the Ninth Circuit finding in *Ladd v. Law & Tech. Press* that § 407 deposit "sustains a national library for public use." 762 F.2d at 810.

The 1993 report of the Advisory Committee on Copyright Registration and Deposit ("ACCORD") reinforced the importance and constitutional grounding of the § 407 deposit requirement. Robert Wedgeworth & Barbara Ringer, *Advisory Committee on Copyright Registration and Deposit: Report of The Co-Chairs* 5 (1993) [hereinafter "ACCORD Report"]. As the report explains, there was some uneasiness that the changes to copyright law in 1988 weakened the force of *Ladd*'s reasoning upholding the constitutionality of § 407. *Id*. at 19–20. But members of ACCORD noted that access to the Library's collections "clearly 'promote the progress of science and useful arts,'" and that the deposit requirement was fundamental to the copyright bargain: "the *quid pro quo* for mandatory deposit is found in the Congressional grant of a system of copyright protection[.]" *Id.* at 20. As one of ACCORD's co-chair's observed, "[i]t would be a serious, perhaps fatal,

10

mistake to divorce mandatory deposit for the Library of Congress from the overall copyright system." *Id*. at A/292.

Today, the Library of Congress continues to further the goals of copyright law via library deposits. The Register of Copyrights and the Librarian of Congress declared the deposit requirement "has been one of the most important methods for building the Library's collections and making it the world's largest repository of knowledge and creativity." Mandatory Deposit of Published Electronic Works Available Only Online, 75 Fed. Reg. 3863, 3865 (Jan. 25, 2010); 37 C.F.R. § 202.24. The Library of Congress is an unmatched world resource for creative works, with a collection of more than 171 million items, including more than 25 million cataloged books and 74.5 million manuscripts. *See* Libr. of Cong., *Annual Report of the Librarian of Congress for the Fiscal Year Ending Sept. 30, 2020*, 11 (2020) [hereinafter "*Library Annual Report for 2020*"]. As explained more fully below, these works are available in perpetuity for the public to access, learn from, and build on in new expressive works.

## II.    The Deposit Requirement Ensures Preservation of and Access to Significant Works at Risk of Disappearance.

The deposit requirement enables the bargain and balance of the Copyright Act by ensuring that the public may access works even after owners lose their incentive to preserve and disseminate them. As the nation's "library of last resort," the Library of Congress has a duty to collect and preserve even obscure works that may not be

found in other collections or on the market. *See* ACCORD Report, Summary of First Meeting, at A/5 ("mandatory deposit . . . allows the Library to act as a library of last resort for recording the existence of cultural works"). The Library dedicates significant resources to preserving these works throughout their period of copyright exclusivity and after they enter the public domain.

### A. Works Deposited Under § 407 Support a Comprehensive and Diverse National Collection.

The deposit requirement is essential to the Library's ability to serve "an indivisible world of culture and books and ideas" and display "the full spectrum of the cultures of mankind." Daniel J. Boorstin, *The Indivisible World: Libraries and the Myth of Cultural Exchange*, in *Center for the Book Viewpoint Series No. 15* 11-12 (1985). The deposit requirement helps fulfill this goal by enhancing the Library's collections, particularly when it comes to rare or less marketed titles. *See* JA 117–18; Libr. of Cong., *Library of Congress Collections Policy Statements: Literature and Language*, 2–3 (Rev. Mar. 2022) [hereinafter "*Literature and Language Collections Policy*"]. The Library does not collect all published material, but both the Library and the Copyright Office base their acquisition efforts under § 407 on subject-matter specific Collections Policy Statements. JA 117–18. Those policy statements provide a framework for developing the Library's collections in line with the Library's overall mission: "to make its resources available and useful [to the public], and to sustain and preserve a universal collection of knowledge and

creativity for future generations." Libr. of Cong., *Introduction to Collections Policy Statements*..

In practice, § 408 deposit captures popular, commercially exploited works because this deposit is a condition of copyright registration. By contrast, § 407 provides a means for the Library to acquire works that its Collections Policy Statements prioritize but are not registered and therefore have not been deposited under § 408. *See* JA 117-18 (explaining the role of Collections Policy Statements in identifying works for deposit under § 407); ACCORD Report at 19 (describing § 407 as a "back-up to voluntary registration and deposit"). The priorities of Collections Policy Statements "include[] acquiring material of underrepresented perspectives and voices in the Library's collections to insure diverse authorship, points of view, cultural identities, and other historical and cultural factors." *Literature and Language Collections Policy* at 2. Thus, § 407 deposit plays a key role in the Library's effort to "build an expansive, yet selective, collection that records the creativity of the United States and is reflective of the nation's diversity and complexity." *Id*.

The § 407 deposit requirement allows the Library to collect and preserve rare works or works of less favored literary genres, periods, or themes, regardless of registration status. Through the requests originating from the Library or via the Copyright Office's application of the Library's collection policies, deposit brings

13

into the Library's collection unregistered works that may be difficult or impossible to obtain by exchange, donation, or purchase. Like Valancourt itself, the Library's collections policies seek out rare and neglected works that could be lost from the national memory. *See* JA 109; *Literature and Language Collections Policy* at 2. The Library collects works from traditionally underrepresented literature genres and fields like LGBTQIA+ studies, women's and gender studies, and ethnic studies. Libr. of Cong., *Library of Congress Collections Policy Statements: LGBTQIA+ Studies* 2 (Rev. Mar. 2022); Libr. of Cong., *Library of Congress Collections Policy Statements: Women's and Gender Studies*, 2-5 (Rev. Apr. 2022); Libr. of Cong., *Library of Congress Collections Policy Statements: Ethnic Materials—United States* 2–3 (Updated Apr. 2022). In sum, the § 407 deposit requirement ensures that the Library collects and preserves more than just what commercial publishers choose to register and market. The requirement helps fulfill the Library's "mandate . . . to have collections that are inclusive and representative of a diversity of creators and ideas." *Literature and Language Collections Policy* at 2.

**B. The Library of Congress's Preservation Efforts Allow the Public to Access Works After Rightsholders Lose Their Incentive to Provide Them.**

The deposit requirement places rare works in the hands of Library staff with the training, resources, and incentive to preserve those works indefinitely. Throughout history, natural disasters, conflicts, and poor preservation techniques

have resulted in the loss of large portions of recorded knowledge and culture. Upholding its core mission, the Library of Congress dedicates significant resources to cutting-edge preservation techniques. These efforts are essential to ensuring public access to works whose owners and publishers have lost the incentive or wherewithal to preserve them.

Major incidents, such as fires, wars, and natural disasters, can wipe out large stores of knowledge very quickly. A 2018 fire destroyed much of the National Museum of Brazil. Ed Yong, *What Was Lost in Brazil's Devastating Museum Fire,* The Atlantic (Sept. 4, 2018). Among the casualties of the fire was an audio archive of indigenous languages, which included some languages that are no longer spoken. *Id*. More recently, a 2021 fire devastated the special collections at the University of Cape Town, including irreplaceable South African works. Nora McGreevy, *Why the Cape Town Fire Is a Devastating Loss for South African Cultural Heritage,* Smithsonian Mag. (Apr. 20, 2021). In war, libraries are often destroyed, intentionally or otherwise. Ukrainian cultural history is threatened by the current Russian invasion; multinational library efforts seek to preserve Ukrainian cultural information stored in libraries and museums before it is destroyed by Russian forces. Pranshu Verma, *Meet the 1,300 Librarians Racing to Back Up Ukraine's Digital Archives,* Wash. Post (Apr. 8, 2022). Major weather events also lay waste to libraries. Hurricane Katrina damaged 700,000 library items at Tulane University and

destroyed 23 public libraries across Louisiana. Parul Zaveri, *Damage to Libraries Due to Water Related Disasters, Library Philosophy and Practice,* Libr. Phil. Prac., Aug. 2014, at 4.

Works can disappear even without the intervention of external events. Many forms of paper deteriorate over time, particularly when stored in inhospitable environments. *See* Gen. Info. Programme and UNISIST, *Lost Memory – Libraries and Archives Destroyed in the Twentieth Century,* 21, UNESCO CIl-96/WS/1 (Mar. 1996). Likewise, as media formats change, many works are not transferred to new formats and fall victim to technological obsolescence. *See generally* Mike Casey, *Why Media Preservation Can't Wait: The Gathering Storm*, 44 Int'l Ass'n of Sound and Audiovisual Archives J. 14, 15 (2015).

Commercial archives and collections may be vulnerable to loss when owners lack a strong economic incentive to properly preserve their works. A 2008 fire at the sound recordings library of Universal Music Group destroyed the masters of an estimated 500,000 song titles. Jody Rosen, *The Day the Music Burned*, N.Y. Times (June 11, 2019). The fire destroyed important masters by iconic performers, such as Chuck Berry, Patsy Cline, Duke Ellington, and Ella Fitzgerald. *Id*. These masters can never be recovered. *See id*. While not as sudden, the slow degradation of collections can lead to even more devastating losses of cultural knowledge. More than 80 percent of American feature films before 1930 have been lost because movie

studios did not store them properly. *A Study of the Current State of American Film Preservation: Volume 1,* Libr. of Cong. (June 1993). Unfortunately, rightsholders who are no longer exploiting works commercially may not view expensive preservation methods as worth their costs. *See* Rosen, *The Day the Music Burned*. .

The repeated extensions of the term of copyright protection have exacerbated the loss of copyrighted works due to market failures. The original fourteen-year term (with an additional fourteen years upon renewal) has been extended multiple times to finally reach the term of life of the author plus 70 years. *See* William F. Patry, 3 Patry on Copyright § 7:1 (2022) (summarizing the extensions of copyright term). Now the term of copyright protection can easily reach 130 years or longer (assuming that an author created a work at a young age) and protects works long after owners lose their interest in exploiting them. *See id*. § 7:2. The lengthy term along with the elimination of formalities that previously helped track ownership of works makes it all the more important for the Library to collect and preserve works long enough to enter the public domain.

This loss of copyrighted works due to market failures is ironic as proponents justified the extension of copyright term on the ground that works entering the public domain would be less likely to be preserved and disseminated. *See Eldred v. Ashcroft*, 537 U.S. 186, 207 (2003) (discussing "projections that longer terms would encourage copyright holders to invest in the restoration and public distribution of

their works." However, an empirical study of mostly digital works found just the opposite: "[c]opyright term extensions have clearly prevented the development of a market for reprinting a massive number of 'missing' works from the 20th century." Heald, *How Copyright Keeps Works Disappeared*, at 861.

Fortunately, the Library is not constrained by market forces in deciding what to preserve and make available. The Library invested more than $31 million in preservation efforts in 2020. Libr. of Cong., *Fiscal 2022 Budget Justification* 79 (2021). These preservation efforts include both preventative and restorative care. In the past 19 years, the Library has dedicated $5.5 million annually to its "mass deacidification" project, neutralizing acid contained in the pages of older books. Libr. of Cong., *Fiscal 2021 Budget Justification* 67 (2020). The Library also builds and maintains facilities that are environmentally optimized to store books for long-term preservation. *Id.* at 68. Additionally, the Library converts works that are "unstable" in their current format to more stable formats like microfilm and digital formats. Kenneth E. Harris & Susan E. Schur, *A Brief History of Preservation and Conservation at the Library of Congress* 25–26 (Oct. 2006). When works are damaged, the Library's sophisticated Collections Care Division applies repair techniques to restore them to their original form. *Id.* at 12–15.

The facts of this case demonstrate why library preservation efforts are critical. Valancourt's founder did not source a copy of Francis Lathom's work from a

commercial publisher. He found it in a library. JA 109. He created a new work from one available because it had been preserved long enough to enter the public domain. *See* JA 110. But he was then unable to comply with the Copyright Office's demand in full because he lost all known copies of some of his own copyrighted works during a home burglary. JA 168–70. A copyrighted work was lost before the public got the full benefit of the copyright bargain. If those books had been deposited with the Library of Congress, they likely would be safe in the Library's collections and available for future generations to access, appreciate, and incorporate into new expressive works.

### C. Access to Deposited Works Expands the Store of Public Knowledge and Leads to the Creation of New Works.

The public benefits of the Library's efforts to collect and preserve works accrue long before those works enter the public domain. The Library makes its expansive collection accessible to members of the public to facilitate the distribution of knowledge. Open to the public, the Library of Congress supports "literacy and an educated citizenry for democracy" and "in many ways [is] seen as the foundation for a democratic society." ACCORD Report, Working Paper 1, at A/60. Through its unparalleled collection, the Library is "a place where any citizen can study any topic or issue on which they might have an interest." *Id.* Any person over the age of sixteen can patronize the Library of Congress and use its Main Reading Room. *LC Lowers Age of Users for Main Reading Room*, 19 Libr. of Cong. Gazette 1 (May 2, 2008).

Researchers who are unable to make a trip to Washington D.C. can receive items from the Library's collections anywhere in the world via interlibrary loan. *Request Items Through Interlibrary Loan*, 5 Libr. of Cong. Mag. 6 (2016). In 2019, the Library circulated more than one million items for use inside and outside the Library. Libr. of Cong., *Annual Report of the Librarian of Congress for the Fiscal Year Ending September 30, 2019*, at 11.

The Library offers a specific program for users with print disabilities. The program, called the National Library Service for the Blind and Print Disabled ("NLS"), distributes braille books and audiobooks both physically and electronically. *Overview*, The Nat'l Libr. Service for the Blind and Print Disabled (2020). The Library converts works into accessible formats in-house. *See id.* The NLS Catalog includes more than 74,000 braille books and more than 207,000 audiobooks. *Id*. In 2020, more than 20 million accessible materials were distributed by NLS. *Library Annual Report for 2020* at 31.

Preservation and access foster a better-informed society and facilitate the creation of new works, serving both First Amendment and copyright interests. This is the core function of the deposit requirement and, indeed, a core function of libraries and archives. These institutions "collect and bring together in single repositories books, journals, music, and a wealth of other materials from a variety of sources in a way that no single individual could, thereby streamlining and facilitating the process by

20

which authors and creators learn from and build upon the work of others." The

Section 108 Study Group Report, U.S. Copyright Office, Mar. 2008, at 14.

### III. Costs Imposed by § 407 Are Minor Compared to the Benefits That Rightsholders Receive From the Copyright System.

It is reasonable to ask rightsholders to deposit copies of a work in exchange

for decades of an exclusive and federally enforced statutory right. However, it is not

even the case that all rightsholders must comply with that requirement. Section 407

gives the Copyright Office significant leeway to modify the deposit requirement in

specific cases or to exclude classes of works from the requirement entirely. 17 U.S.C.

§ 407(c). The Office has exercised that authority to alleviate burdens and avoid

absurd results. Nor is it the case that benefits of copyright accrue only when

rightsholders register their works: from the moment of fixation, rightsholders can

invoke statutory protections and benefit from federal government enforcement

efforts. Finally, the deposit requirement itself benefits authors and publishers,

including publishers like Valancourt.

### A.  The Burdens of § 407 Have Been Overstated.

A fair assessment of § 407's burdens must include the exemptions and relief

it empowers the Office to create or grant. *Id.* ("The Register of Copyrights may by

regulation exempt any categories of material for the deposit requirements of this

section, or require deposit of only one copy or phonorecord with respect to any

categories."). The Office may exempt certain categories of works entirely or provide

for "alternate forms of deposit aimed at proving a satisfactory archival copy of a work without imposing practical or financial hardships on the depositor." *Id*.

The Office has wielded this authority to exclude scientific models and diagrams, greeting cards, lectures, sermons, speeches, and works embodied only in phonorecords. 37 C.F.R. § 202.19(c). The Office's regulations contain a qualified exemption for e-books and other electronic works published in the United States so long as they are available only online or via a print-on-demand model. 37 C.F.R. § 202.19(b)(4), (c)(5). Instead, these works are subject to deposit only if requested by the Office and, even then, the Office can grant special relief, such as extending the time to deposit or accepting incomplete and inferior editions. 37 C.F.R. §§ 202.19(c)(5), 202.24(d). This exemption avoids absurd results such as having to deposit copies of blogs or tweets (assuming posting on Twitter constitutes publication under the Act).

Even when no generally applicable exemption is available, the Office may grant special relief to the copyright owner or publisher. That relief may include granting an exemption entirely or modifying the deposit requirement to accept fewer copies, inferior editions, or identifying material in lieu of deposit copies. 37 C.F.R. § 202.19(e). The Office exercised the flexibility afforded by § 407 when Valancourt objected to the written demand. JA 123; 133–41. It both reduced the number of works for which copies were sought and accepted electronic copies in lieu of printed

22

versions. JA 119, 123, 140–43. Portraying § 407 as an inflexible requirement that applies to all published works without exception or variation is inconsistent with the text of the statute, implementing regulations, and the facts of this case.

Finally, the § 407 deposit requirement is far less problematic than the preferred alternative of Valancourt and its *amici*. To require the Library to instead purchase all works in the national collection would simply add an additional tax on the public's right to read. When recommending against this option in 1993, members of ACCORD estimated that the cost of additional staff and operational expenses— excluding space and office equipment—would cost the Library approximately $34 million per year. ACCORD Report, Working Paper No. 1, at A/58. This is more than the Library currently spends each year on preservation efforts. Further, a purchase-only policy would raise unavoidable First Amendment concerns: "[i]f the library chose not to purchase an item for any reason, it would be open to charges of censorship. If it purchased controversial material (as of course it would), like publicly supported libraries everywhere, it might be asked not to purchase such material." *Id*. Thus, Committee members advised retaining the deposit requirement as "one of the few costs charged to copyright owners for the copyright system." ACCORD Report, Working Paper 11, at A/318.

## B. Rightsholders Benefit From Copyright Protection and Enforcement Even Without Registering Their Works.

In justifying the measured costs of § 407 deposit, ACCORD members explained that rightsholders "can be fairly charged this expense [because of] the existence of the statutory benefits of copyright, which provide enormous commercial advantages to copyright owners." *Id.* Copyright is a government-granted monopoly that, unlike other forms of intellectual property, "vests as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020).

An extensive enforcement regime accompanies those exclusive rights. However prosaic Valancourt's reasons were in affixing a copyright notice to its works, the notice signaled significant and consequential penalties for infringing Valancourt's exclusive rights. Private parties are not without government support in seeking those penalties. The Departments of Justice, Commerce, State, and Homeland Security, in accordance with a Joint Strategic Plan set forth by an ambassador-level appointee within the Executive Office of the President, all participate in the protection of rightsholders' copyright interests. 15 U.S.C. § 8111. Most recently, Congress created a new felony offense for infringing copyrighted works via streaming. *See* 18 U.S.C. § 2319(c).

Aside from the assistance of federal law enforcement, rightsholders enjoy many protections that do not depend on copyright registration. Rightsholders may

initiate extrajudicial notice-and-takedown procedures when they find their works posted by others online. 17 U.S.C. § 512(c). They may also pursue cases against those who circumvent access controls on their works regardless of registration status. 17 U.S.C. § 1201. As with the exclusive rights granted by the Copyright Act, rightsholders enjoy these enforcement mechanisms for decades. Thus, there was nothing prosaic about Valancourt's (somewhat inaccurate) warning in its books that "the use of any part of this publication reproduced, transmitted in any form or by any means . . . constitutes an infringement of the copyright law." JA 113, ¶ 29.

### C. Authors and Publishers Benefit From Library Deposits.

Section 407 deposit ensures that culturally significant works are not lost simply because a copyright owner or publisher declines to register those works. Those works are preserved in the national collection and made available to the public. They then become the foundations for new creative works, expanding our horizons and furthering the aims of the Copyright Clause and the Copyright Act. *See* Zechariah Chafee, Jr., *Reflections on Copyright: I*, 45 Colum. L. Rev. 503, 511 (1945) ("The world goes ahead because each of us builds on the work of our predecessors. 'A dwarf standing on the shoulders of a giant can see farther than the giant himself.'"). Copyright law and policy presuppose that works will be accessible in depositories, where authors will be able to reflect upon them and create new works. ACCORD Report, Summary of Third Meeting, at A/22.

That is essentially what happened here. Troubled by the fact that "many great books remain out-of-print and inaccessible," Valancourt's founders sought "to restore many of these works to new generations of readers." *Our History*, Valancourt Books. Some of the books Valancourt has republished were so rare that they had survived in only a single known copy. JA 111. Valancourt's founder began with the works of Francis Lathom, which he found at the University of Nebraska library. JA 109.

Library deposits are instrumental to efforts of publishers like Valancourt that republish works found in the public domain. Many published works tend to disappear shortly after their initial publication and commercial exploitation, only to reappear once they enter the public domain and may be freely repackaged into new works with original content. Heald, *How Copyright Keeps Works Disappeared*, at 839. Library deposits are an essential bridge between these two periods of time. Entry into the national collection and the Library's efforts to preserve and provide public access to works ensures that a work such as a nineteenth century gothic novel will still be available when a publisher like Valancourt takes a renewed interest in the work and republishes it with new expressive material. With that republication, Valancourt has benefited from both sides of the copyright bargain. The § 407 deposit requirement ensures those benefits are available to others.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: June 3, 2022

Respectfully submitted,[*]

 */s/ Erik Stallman*
Erik Stallman
Samuelson Law, Technology
    & Public Policy Clinic
UC Berkeley School of Law
587 Simon Hall
Berkeley, CA 94702
(510) 642-2485
estallman@clinical.law.berkeley.edu

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for Amici Curiae*

---

[*] Counsel thanks Samantha Cox-Parra, Peter Welch, and Barbara Rowinska for their contributions to the brief.

27

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,303 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


Dated: June 3, 2022                    */s/ Erik Stallman*

## CERTIFICATE OF SERVICE

I, Erik Stallman, an attorney, hereby certify that on June 3, 2022, I caused the foregoing brief to be filed with the Court and to be served upon counsel via the Court's ECF email system.

Dated: June 3, 2022                    */s/ Erik Stallman*_____

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

37 C.F.R. § 202.19...................................................................................A1

**37 C.F.R. § 202.19.  Deposit of published copies or phonorecords for the Library of Congress.**

(a) *General*. This section prescribes rules pertaining to the deposit of copies and phonorecords of published works for the Library of Congress under section 407 of title 17 of the United States Code. The provisions of this section are not applicable to the deposit of copies and phonorecords for purposes of copyright registration under section 408 of title 17, except as expressly adopted in § 202.20.

(b) *Definitions*. For the purposes of this section:

(1)(i) The best edition of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes. The "best edition" requirement is described in detail at Appendix B to this part.

(ii) Criteria for selection of the "best edition" from among two or more published editions of the same version of the same work are set forth in the statement entitled "Best Edition of Published Copyrighted Works for the Collections of the Library of Congress" (hereafter referred to as the "Best Edition Statement") in effect at the time of deposit.

(iii) Where no specific criteria for the selection of the "best edition" are established in the Best Edition Statement, that edition which, in the judgment of the Library of Congress, represents the highest quality for its purposes shall be considered the "best edition." In such cases:

(A) When the Copyright Office is aware that two or more editions of a work have been published it will consult with other appropriate officials of the Library of Congress to obtain instructions as to the "best edition" and (except in cases for which special relief is granted) will require deposit of that edition; and

(B) When a potential depositor is uncertain which of two or more published editions comprises the "best edition", inquiry should be made to Acquisitions and Deposits.

(iv) Where differences between two or more "editions" of a work represent variations in copyrightable content, each edition is considered a separate version, and hence a different work, for the purpose of this section, and criteria of "best edition" based on such differences do not apply.

(2) A complete copy includes all elements comprising the unit of publication of the best edition of the work, including elements that, if considered separately, would not be copyrightable subject matter or would otherwise be exempt from the mandatory deposit requirement under paragraph (c) of this section.

(i) In the case of sound recordings, a "complete" phonorecord includes the phonorecord, together with any printed or other visually perceptible material

A1

published with such phonorecord (such as textual or pictorial matter appearing on record sleeves or album covers, or embodied in leaflets or booklets included in a sleeve, album, or other container).

  (ii) In the case of a musical composition published in copies only, or in both copies and phonorecords:

  (A) If the only publication of copies in the United States took place by the rental, lease, or lending of a full score and parts, a full score is a "complete" copy; and

  (B) If the only publication of copies in the United States took place by the rental, lease, or lending of a conductor's score and parts, a conductor's score is a "complete" copy.

  (iii) In the case of a motion picture, a copy is "complete" if the reproduction of all of the visual and aural elements comprising the copyrightable subject matter in the work is clean, undamaged, undeteriorated, and free of splices, and if the copy itself and its physical housing are free of any defects that would interfere with the performance of the work or that would cause mechanical, visual, or audible defects or distortions.

  (iv) In the case of an electronic work published in the United States and available only online, a copy is "complete" if it includes all elements constituting the work in its published form, i.e., the complete work as published, including metadata and formatting codes otherwise exempt from mandatory deposit.

  (3) The terms architectural works, copies, collective work, device, fixed, literary work, machine, motion picture, phonorecord, publication, sound recording, useful article, and their variant forms, have the meanings given to them in 17 U.S.C. 101.

  (4) For purposes of paragraph (c)(5) of this section:

  (i) An electronic-only serial is a serial as defined in § 202.3(b)(1)(v) that is published in electronic form in the United States and available only online.

  (ii) An electronic-only book is an electronic literary work published in one volume or a finite number of volumes published in the United States and available only online. This class excludes literary works distributed solely in phonorecords (e.g., audiobooks), serials (as defined in § 202.3(b)(1)(v)), computer programs, websites, blogs, emails, and short online literary works such as social media posts.

  (iii) A work shall be deemed to be available only online even if copies have been made available to individual consumers or other end users to print on demand, so long as the work is otherwise available only online. A work also shall be deemed to be available only online even if copies have been loaded onto electronic devices, such as tablets or e-readers, in advance of sale to individual consumers, so long as the work is otherwise available only online.

  (5) The term literary monograph means a literary work published in one volume or a finite number of volumes. This category does not include serials, nor does it include legal publications that are published in one volume or a finite number of

volumes that contain legislative enactments, judicial decisions, or other edicts of government.

(c) *Exemptions from deposit requirements*. The following categories of material are exempt from the deposit requirements of section 407(a) of title 17:

(1) Diagrams and models illustrating scientific or technical works or formulating scientific or technical information in linear or three-dimensional form, such as an architectural or engineering blueprint, plan, or design, a mechanical drawing, or an anatomical model.

(2) Greeting cards, picture postcards, and stationery.

(3) Lectures, sermons, speeches, and addresses when published individually and not as a collection of the works of one or more authors.

(4) Literary, dramatic, and musical works published only as embodied in phonorecords. This category does not exempt the owner of copyright, or of the exclusive right of publication, in a sound recording resulting from the fixation of such works in a phonorecord from the applicable deposit requirements for the sound recording.

(5) Electronic works published in the United States and available only online. This exemption includes electronic-only books and electronic serials available only online only until such time as a demand is issued by the Copyright Office under the regulations set forth in § 202.24. This exemption does not apply to works that are published in both online, electronic formats and in physical formats, which remain subject to the appropriate mandatory deposit requirements.

(6) Three-dimensional sculptural works, and any works published only as reproduced in or on jewelry, dolls, toys, games, plaques, floor coverings, wallpaper and similar commercial wall coverings, textiles and other fabrics, packaging material, or any useful article. Globes, relief models, and similar cartographic representations of area are not within this category and are subject to the applicable deposit requirements.

(7) Prints, labels, and other advertising matter, including catalogs, published in connection with the rental lease, lending, licensing, or sale of articles of merchandise, works of authorship, or services.

(8) Tests, and answer material for tests when published separately from other literary works.

(9) Works first published as individual contributions to collective works. This category does not exempt the owner of copyright, or of the exclusive right of publication, in the collective work as a whole, from the applicable deposit requirements for the collective work.

(10) Works first published outside the United States and later published in the United States without change in copyrightable content, if:

(i) Registration for the work was made under 17 U.S.C. 408 before the work was published in the United States; or

(ii) Registration for the work was made under 17 U.S.C. 408 after the work was published in the United States but before a demand for deposit is made under 17 U.S.C. 407(d).

(11) Works published only as embodied in a soundtrack that is an integral part of a motion picture. This category does not exempt the owner of copyright, or of the exclusive right of publication, in the motion picture, from the applicable deposit requirements for the motion picture.

(12) Motion pictures that consist of television transmission programs and that have been published, if at all, only by reason of a license or other grant to a nonprofit institution of the right to make a fixation of such programs directly from a transmission to the public, with or without the right to make further uses of such fixations.

(d) *Nature of required deposit*. (1) Subject to the provisions of paragraph (d)(2) of this section, the deposit required to satisfy the provisions of section 407(a) of title 17 shall consist of:

(i) In the case of published works other than sound recordings, two complete copies of the best edition; and

(ii) In the case of published sound recordings, two complete phonorecords of the best edition.

(2) In the case of certain published works not exempt from deposit requirements under paragraph (c) of this section, the following special provisions shall apply:

(i) In the case of published three-dimensional cartographic representations of area, such as globes and relief models, the deposit of one complete copy of the best edition of the work will suffice in lieu of the two copies required by paragraph (d)(1) of this section.

(ii) In the case of published motion pictures, the deposit of one complete copy of the best edition of the work will suffice in lieu of the two copies required by paragraph (d)(1) of this section. Any deposit of a published motion picture must be accompanied by a separate description of its contents, such as a continuity, pressbook, or synopsis. The Library of Congress may, at its sole discretion, enter into an agreement permitting the return of copies of published motion pictures to the depositor under certain conditions and establishing certain rights and obligations of the Library with respect to such copies. In the event of termination of such an agreement by the Library it shall not be subject to reinstatement, nor shall the depositor or any successor in interest of the depositor be entitled to any similar or subsequent agreement with the Library, unless at the sole discretion of the Library

it would be in the best interests of the Library to reinstate the agreement or enter into a new agreement.

(iii) In the case of any published work deposited in the form of a hologram, the deposit shall be accompanied by:

(A) Two sets of precise instructions for displaying the image fixed in the hologram; and

(B) Two sets of identifying material in compliance with § 202.21 and clearly showing the displayed image.

(iv) In any case where an individual author is the owner of copyright in a published pictorial or graphic work and:

(A) Less than five copies of the work have been published; or

(B) The work has been published and sold or offered for sale in a limited edition consisting of no more than three hundred numbered copies, the deposit of one complete copy of the best edition of the work or, alternatively, the deposit of photographs or other identifying material in compliance with § 202.21, will suffice in lieu of the two copies required by paragraph (d)(1) of this section.

(v) In the case of a musical composition published solely in copies, or in both copies and phonorecords, the deposit of one complete copy of the best edition will suffice in lieu of the two copies required by paragraph (d)(1) of this section.

(vi) In the case of published multimedia kits that include literary works, audiovisual works, sound recordings, or any combination of such works, the deposit of one complete copy of the best edition will suffice in lieu of the two copies required by paragraph (d)(1) of this section.

(vii) In the case of published computer programs and published computerized information works, such as statistical compendia, serials, and reference works that are not copy-protected, the deposit of one complete copy of the best edition as specified in the current Library of Congress Best Edition Statement will suffice in lieu of the two copies required by paragraph (d)(1) of this section. If the works are copy-protected, two copies of the best edition are required.

(viii) In the case of published architectural works, the deposit shall consist of the most finished form of presentation drawings in the following descending order of preference:

(A) Original format, or best quality form of reproduction, including offset or silk screen printing;

(B) Xerographic or photographic copies on good quality paper;

(C) Positive photostat or photodirect positive;

(D) Blue line copies (diazo or ozalid process). If photographs are submitted, they should be 8 × 10 inches and should clearly show several exterior and interior views. The deposit should disclose the name(s) of the architect(s) and draftsperson(s) and the building site.

(ix) In the case of published literary monographs, the deposit of one complete copy of the best edition of the work will suffice in lieu of the two copies required by paragraph (d)(1) of this section, unless the Copyright Office issues a demand for a second copy pursuant to 17 U.S.C. 407(d).

(x) In the case of published newspapers, a deposit submitted pursuant to and in compliance with the group registration option under § 202.4(e) shall be deemed to satisfy the mandatory deposit obligation under this section.

(xi) In the case of serials (as defined in § 202.3(b)(1)(v), but excluding newspapers) published in the United States in a physical format, or in both a physical and an electronic format, the copyright owner or the owner of the exclusive right of publication must provide the Library of Congress with two complimentary subscriptions to the serial, unless Acquisitions and Deposits informs the owner that the serial is not needed for the Library's collections. Subscription copies must be physically mailed to the Copyright Office, at the address for mandatory deposit copies specified in § 201.1(c) of this chapter, promptly after the publication of each issue, and the subscription(s) must be maintained on an ongoing basis. The owner may cancel the subscription(s) if the serial is no longer published by the owner, if the serial is no longer published in the United States in a physical format, or if Acquisitions and Deposits informs the owner that the serial is no longer needed for the Library's collections. In addition, prior to commencing the subscriptions, the owner must send a letter to Acquisitions and Deposits at the address specified in § 201.1(b) of this chapter confirming that the owner will provide the requested number of subscriptions for the Library of Congress. The letter must include the name of the publisher, the title of the serial, the International Standard Serial Number ("ISSN") that has been assigned to the serial (if any), and the issue date and the numerical or chronological designations that appear on the first issue that will be provided under the subscriptions.

(e) *Special relief.* (1) In the case of any published work not exempt from deposit under paragraph (c) of this section, the Register of Copyrights may, after consultation with other appropriate officials of the Library of Congress and upon such conditions as the Register may determine after such consultation:

(i) Grant an exemption from the deposit requirements of section 407(a) of title 17 on an individual basis for single works or series or groups of works; or

(ii) Permit the deposit of one copy or phonorecord, or alternative identifying material, in lieu of the two copies or phonorecords required by paragraph (d)(1) of this section; or

(iii) Permit the deposit of incomplete copies or phonorecords, or copies or phonorecords other than those normally comprising the best edition; or

A6

(iv) Permit the deposit of identifying material which does not comply with § 202.21.

(2) Any decision as to whether to grant such special relief, and the conditions under which special relief is to be granted, shall be made by the Register of Copyrights after consultation with other appropriate officials of the Library of Congress, and shall be based upon the acquisition policies of the Library of Congress then in force.

(3) Requests for special relief under this paragraph shall be made in writing to the Associate Register of Copyrights and Director of the Office of Registration Policy and Practice, shall be signed by or on behalf of the owner of copyright or of the exclusive right of publication in the work, and shall set forth specific reasons why the request should be granted.

(4) The Register of Copyrights may, after consultation with other appropriate officials of the Library of Congress, terminate any ongoing or continuous grant of special relief. Notice of termination shall be given in writing and shall be sent to the individual person or organization to whom the grant of special relief had been given, at the last address shown in the records of the Copyright Office. A notice of termination may be given at any time, but it shall state a specific date of termination that is at least 30 days later than the date the notice is mailed. Termination shall not affect the validity of any deposit made earlier under the grant of special relief.

(f) *Submission and receipt of copies and phonorecords*. (1) All copies and phonorecords deposited in the Copyright Office will be considered to be deposited only in compliance with section 407 of title 17 unless they are accompanied by an application for registration of a claim to copyright in the work represented by the deposit, and either a registration fee or a deposit account number. Copies or phonorecords deposited without such an accompanying application and either a fee or a deposit account notation will not be connected with or held for receipt of separate applications, and will not satisfy the deposit provisions of section 408 of title 17 or § 202.20.

(2) All copies and phonorecords deposited in the Copyright Office under section 407 of title 17, unless accompanied by written instructions to the contrary, will be considered to be deposited by the person or persons named in the copyright notice on the work.

(3) Upon request by the depositor made at the time of the deposit, the Copyright Office will issue a certificate of receipt for the deposit of copies or phonorecords of a work under this section. Certificates of receipt will be issued in response to requests made after the date of deposit only if the requesting party is identified in the records of the Copyright Office as having made the deposit. In either case, requests for a certificate of receipt must be in writing and accompanied by the appropriate fee, as required in § 201.3(c). A certificate of receipt will include identification of the

A7

depositor, the work deposited, and the nature and format of the copy or phonorecord deposited, together with the date of receipt.