# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────

Argued October 13, 2022          Decided August 29, 2023

No. 21-5203

VALANCOURT BOOKS, LLC,
APPELLANT

v.

MERRICK B. GARLAND, ATTORNEY GENERAL AND SHIRA
PERLMUTTER, IN HER OFFICIAL CAPACITY AS THE REGISTER OF
COPYRIGHTS OF THE U.S. COPYRIGHT OFFICE,
APPELLEES

─────

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01922)

─────

*Robert J. McNamara* argued the cause for appellant. With
him on the briefs were *Jeffrey H. Redfern* and *James D.
Jenkins*.

*Michael J. Mazzone* was on the brief for *amici curiae* Zvi
S. Rosen and Brian L. Frye in support of appellant.

*Jacqueline C. Charlesworth* was on the brief for *amicus
curiae* Association of American Publishers, Inc. in support of
appellant.

2

*David Bookbinder* was on the brief for *amicus curiae* the Niskanen Center in support of appellant.

*Laura E. Myron*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Daniel Tenny,* Attorney.

*Jonathan Band* and *Erik Stallman* were on the brief for *amici curiae* American Library Association, et al. in support of appellees.

Before: SRINIVASAN, *Chief Judge*, HENDERSON, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  Under Section 407 of the Copyright Act, the owner of the copyright in a work must deposit two copies of the work with the Library of Congress within three months of its publication.  The Copyright Office enforces Section 407's deposit requirement by issuing demand letters informing noncomplying copyright owners that they must either deposit copies or pay a fine.

In June 2018, the Copyright Office sent a letter to Valancourt Books, LLC, an independent press based in Richmond, Virginia, demanding physical copies of Valancourt's published books on the pain of fines.  Valancourt protested that it could not afford to deposit physical copies and that much of what it published was in the public domain.  In response, the Office narrowed the list of demanded works but continued to demand that Valancourt deposit copies of its books with the Library of Congress or otherwise face a fine.

3

Valancourt then brought this action against the Register of Copyrights and the Attorney General. Valancourt challenges the application of Section 407's deposit requirement against it as an unconstitutional taking of its property in violation of the Fifth Amendment and an invalid burden on its speech in violation of the First Amendment. The district court granted summary judgment to the government on both claims.

We conclude that Section 407, as applied by the Copyright Office in this case, worked an unconstitutional taking of Valancourt's property. The Office demanded that Valancourt relinquish property (physical copies of copyrighted books) on the pain of fines. And because the requirement to turn over copies of the works is not a condition of attaining (or retaining) copyright protection in them, the demand to forfeit property cannot be justified as the conferral of a benefit—i.e., copyright protection—in exchange for property. Our holding relates solely to the Office's demand for physical copies of Valancourt's copyrighted works: we have no occasion to assess the Office's offer during the litigation to accept electronic copies in lieu of physical copies.

The Office now indicates that Valancourt could avoid relinquishing the property by disavowing copyright protection. But that ostensible option was never made known in any regulation, guidance, or communication, and instead was mentioned for the first time in this litigation. Whatever may be the legal significance of an option of that sort if it were costless and known to be available, it cannot save a demand for property containing no suggestion whatever of its existence.

Because we conclude that Valancourt prevails on its claim under the Takings Clause, we do not reach its claim under the First Amendment, which ultimately would afford the same scope of relief. We reverse the district court's grant of

4

summary judgment in the government's favor and remand for the entry of judgment to Valancourt and the award of relief consistent with our decision.

I.

A.

The Copyright Clause of the Constitution grants Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8.  Congress first exercised that power in 1790 by establishing a federal copyright regime.  *See* Copyright Act of 1790, ch. 15, 1 Stat. 124.  That regime has remained in place through the present day, even if some of its particulars have varied over time.

Under the copyright laws in their current formulation, creators of works such as literary works, musical works, and graphic works enjoy copyright protection for the fruits of their labor.  "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated."  17 U.S.C. § 102(a).  Copyright thus accrues automatically upon creation of an original work in a tangible medium, and creators need not take any further action such as publication or registration to gain the protection.

Copyright owners possess "exclusive rights to do and to authorize" certain actions, including the rights to "reproduce the copyrighted work in copies," "prepare derivative works based upon the copyrighted work," and "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *Id.*

5

§ 106(1)–(3).  Those rights generally last through "the life of the author and 70 years after the author's death."  *Id.* § 302(a).

At issue here is the mandatory deposit requirement found in Section 407 of the Copyright Act.  *Id.* § 407.  That provision states that "the owner of copyright or of the exclusive right of publication in a work published in the United States shall deposit, within three months after the date of such publication . . . two complete copies of the best edition" of the work.  *Id.* § 407(a)(1).  The "required copies . . . shall be deposited in the Copyright Office for the use or disposition of the Library of Congress."  *Id.* § 407(b).  Because the deposit requirement is triggered upon "publication," *id.* § 407(a), unpublished works are not subject to it.  For most literary works, the Copyright Office's regulations presently require deposit of only a single copy rather than two copies, although the Office reserves the right to request a second copy.  *See* 37 C.F.R. § 202.19(d)(2)(ix).

To enforce the mandatory deposit requirement, the Copyright Office "may make written demand for the required deposit on any of the persons obligated to make the deposit under [Section 407(a)]."  17 U.S.C. § 407(d).  If a copyright owner fails to make the "required deposit" within three months of a demand, she becomes liable for a "fine of not more than $250 for each work" in addition to "the total retail price of the copies or phonorecords demanded" (or, "if no retail price has been fixed, the reasonable cost to the Library of Congress of acquiring" those works).  *Id.* § 407(d)(1)–(2).  And if the copyright owner "willfully or repeatedly fails or refuses to comply with such a demand," she becomes liable for an additional $2,500 fine.  *Id.* § 407(d)(3).  As an indication of the scale of Section 407's operation, from fiscal year 2013 through the first quarter of fiscal year 2019, the Copyright Office

6

demanded 27,847 titles under the provision's mandatory deposit requirement.

Although the mandatory deposit requirement broadly applies to published works, the Copyright Office's regulations give copyright owners an avenue to ask the Office for "special relief" from the requirement. *See* 37 C.F.R. § 202.19(e). The Office can also raise the possibility of special relief directly with those who express concerns about compliance. Joint Stipulations of Fact ¶ 59, J.A. 119. If granted by the Copyright Office, special relief can exempt copyright owners from Section 407's requirements altogether or can authorize them to deposit a quantity or format of copies of a work different from the default statutory requirement of "two complete copies of the best edition." *See* 17 U.S.C. § 407(a)(1); 37 C.F.R. § 202.19(e)(1).

B.

Valancourt is an independent press that publishes rare and out-of-print fiction. Run out of the Richmond, Virginia, home of founder James Jenkins and his husband, Valancourt prints copies of its books "on-demand," i.e., in response to a specific order or request. Although Valancourt has never deposited its works under Section 407—nor registered them under Section 408, a separate provision of copyright law governing copyright registration, *see* 17 U.S.C. § 408—Valancourt places copyright notices in its books.

In June 2018, Valancourt received a letter from the Copyright Office setting forth a demand under Section 407 for "one complete copy" of 341 books published by Valancourt "for the use or disposition of the Library of Congress." Letter from Michael Lind, Copyright Off. Acquisitions Specialist, to James Jenkins (June 11, 2018), J.A. 130. True to the statute's

7

terms, the Office explained that failure to comply would make Valancourt liable for a fine of up to $250 per work and the total retail price of the copies demanded, as well as an additional fine of $2,500 for a willful and repeated failure to comply.  The Office clarified that Valancourt's obligation to deposit works under Section 407 "exists regardless of whether copyright registration [pursuant to Section 408] is sought." *Id.*

Valancourt responded to the Copyright Office's demand the next day.  It estimated that compliance with the demand would cost over $2,500, and advised that, as a "very small publisher," it could not afford that sum.  E-mail from James Jenkins to Angela Coles, Copyright Off. Acquisitions Assistant (June 12, 2018), J.A. 134.  Valancourt also observed that some of its books contained material in the public domain and that it had already deposited some works through the Cataloging-in-Publication program, a separate program run by the Library of Congress.  Valancourt requested that the Copyright Office withdraw its demand and offered to sell copies of any of the listed titles to the government at cost with no markup.

The Copyright Office responded in August 2018, maintaining its position that Valancourt was obligated to deposit books pursuant to Section 407.  The Office explained that deposits for Cataloging-in-Publication did not fulfill Section 407's requirements.  After further research, however, the Office had determined that some of Valancourt's books contained material exclusively in the public domain, and it thus narrowed the list of demanded works to 240 books.  The Office enclosed an updated demand letter that reiterated the fines for failure to deposit.

8

C.

In August 2018, Valancourt brought this action against the Attorney General and the Register of Copyrights. Valancourt sought a declaration that the application of Section 407 is unconstitutional under the First and Fifth Amendments, as well as an injunction against the provision's enforcement. Valancourt contended that Section 407's application violates the First Amendment because it unlawfully burdens speech and is overbroad, and that it also violates the Fifth Amendment because it represents an uncompensated taking of property.

In March 2019, the Copyright Office reached out to Valancourt's counsel in an e-mail containing the header "CONFIDENTIAL SETTLEMENT COMMUNICATION." E-mail from Daniel Riess, Trial Attorney, Fed. Programs Branch, Dep't of Just., to Robert McNamara, Counsel for Valancourt (Mar. 11, 2019), J.A. 173. The communication included an "offer, in full settlement for all of Valancourt's claims, [of] permission for Valancourt to deposit the 240 requested titles in electronic format." *Id.* Invoking its regulatory authority to grant special relief when mandatory deposit would be an "unsustainable economic burden," the Office explained that its grant of special relief would also "extend to any request by the Copyright Office for future publications by Valancourt." *Id.*; *see* 17 U.S.C. § 407(c); 37 C.F.R. § 202.19(e).

Valancourt rejected the Copyright Office's offer. In its subsequent briefing to the district court, it gave two reasons for its rejection. First, Valancourt objected to the idea that it would receive special treatment while other small publishers would continue to be subject to Section 407's mandatory deposit requirement. Second, it did not believe it could comply with the offer because it likely lost electronic copies of at least some

9

of its works in part due to a home burglary. *See* Pl.'s Suppl. Br. 2–3, *Valancourt Books, LLC v. Perlmutter*, 554 F. Supp. 3d 26 (D.D.C. 2021), No. 18-cv-1922.

The parties cross-moved for summary judgment. The government represented that its settlement offer to accept electronic copies stood regardless of whether Valancourt agreed to settle its claims. Defs.' Combined Memorandum in Supp. of Their Mot. for Summ. J. & in Opp'n to Pl.'s Cross-Mot. for Summ. J. at 20–21 n.8., *Valancourt Books*, 554 F. Supp. 3d 26, No. 18-cv-1922. In December 2020, the district court ordered supplemental briefing on whether the Copyright Office's offer to accept electronic copies had mooted the dispute. *See* Order at 3, *Valancourt Books*, 554 F. Supp. 3d 26, No. 18-cv-1922. Both parties agreed that Valancourt's potential rejection of the offer would not moot the dispute.

In July 2021, the district court granted summary judgment in favor of the government. *Valancourt Books, LLC v. Perlmutter*, 554 F. Supp. 3d 26 (D.D.C. 2021). The court first concluded that the Copyright Office's offer to accept electronic copies of Valancourt's works had not mooted the dispute but instead had "narrowed" it to one about electronic copies. *Id.* at 32–33. The court then rejected both of Valancourt's constitutional claims.

On Valancourt's Fifth Amendment claim, the court held that Section 407 does not run afoul of the Takings Clause because it represents a voluntary exchange for federal copyright protection. *Id.* at 33–36. The court viewed Section 407 as a condition on the receipt of the governmental benefit of copyright protection, and it characterized Valancourt as having accepted that condition by voluntarily placing notices of copyright on its books. *Id.* at 35. The court also pointed to Valancourt's refusal to disavow copyright protection despite

10

the Copyright Office's representation that, if Valancourt did so, the Office would withdraw its deposit requirement. *Id.* at 38. The court further mentioned that it is "not at all clear" how principles developed in the context of real or personal property would apply to the Copyright Office's alternative demand of electronic copies. *Id.* at 36.

The court next rejected Valancourt's First Amendment claim. It concluded that Section 407 does not burden speech at all, and that, even if it were subject to First Amendment scrutiny, it would survive because it does not burden more speech than necessary. *Id.* at 40–41.

Valancourt now appeals. It challenges the district court's conclusion that the dispute has been narrowed to one about electronic copies, as well as the court's grant of summary judgment to the government on Valancourt's First and Fifth Amendment claims.

II.

Because the scope of the dispute before us necessarily affects our analysis of the merits of the challenge, we first determine whether the dispute encompasses only the Copyright Office's offer to accept electronic copies of the copyrighted works or also reaches the Office's original demand for physical copies. We agree with Valancourt that the dispute has not been narrowed to encompass only electronic copies.

After Valancourt filed its complaint challenging the Copyright Office's demand for physical copies of copyrighted works, the Office offered to accept electronic copies in lieu of physical copies. That offer did not moot Valancourt's challenge to the demand for physical copies. A party's voluntary cessation of challenged conduct does not moot the

11

challenge unless it is "absolutely clear" that the challenged conduct will not recur after the litigation. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S 167, 189 (2000)); *see, e.g.*, *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221–25 (2000). No one argues that standard is satisfied here, as the Office can continue to demand physical copies from copyright holders (including Valancourt) and has indicated no intention to cease doing so. Indeed, the Office has not withdrawn its demand for physical copies in this case itself—rather, it has only offered to accept electronic copies as an alternative way to satisfy its continuing demand for physical copies. We thus will address the Office's demand for physical copies, consistent with our general obligation to decide cases within our jurisdiction. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

As for the Office's offer to accept electronic copies as an alternative, Valancourt advised the district court that the court "need not address" whether electronic copies constitute property subject to the Takings Clause because, regardless of the Office's offer, Valancourt would still need to deposit physical copies of certain books for which it cannot produce electronic copies. Pl.'s Suppl. Br. 7–8 & n.3, *Valancourt Books*, 554 F. Supp. 3d 26, No. 18-cv-1922; *see* Jenkins Suppl. Decl. ¶¶ 7, 9, J.A. 169–70. Valancourt does not ask our court to assess the Office's alternative demand for electronic copies, either, instead requesting that we assess its "original constitutional claims." Valancourt Br. 20. The government likewise does not ask us to go on to evaluate the Office's alternative demand for electronic copies if we invalidate the baseline demand for physical copies. Rather, the government generally defends its interpretation of Section 407 without

12

eschewing its ability to enforce that provision through physical copies.

Because neither party appears to ask us to reach the question, and because the presentation of the case does not require us to do so, we will not proceed to evaluate the constitutionality of Section 407 as enforced through electronic copies. "[I]n the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). The parties' focus on physical copies explains why they, and the district court, largely did not discuss how Section 407 would fare if enforced through only electronic copies. As the district court recognized, that analysis might raise unique questions. For example, the court observed, it "is not at all clear" how the principles of the Takings Clause "developed in the context of 'real property' . . . would apply to a requirement that can be fulfilled by the transmission of digital copies." 554 F. Supp. 3d at 36.

The parties' understanding of the Copyright Office's offer as an alternative way to fulfill Section 407's requirements reinforces that this dispute is ultimately about physical copies. Both parties stipulated that the Office's offer was to accept electronic copies "in lieu of physical copies." Joint Stipulations of Fact ¶ 61, J.A. 119. If the demand for physical books is unconstitutional, as we conclude it is, the predicate for the Office's alternative offer then falls away, and we have no need to assess its constitutionality. Accordingly, we will evaluate only the Office's demand for physical copies.

13

III.

Valancourt contends that Section 407's mandatory deposit requirement, as enforced by the government, violates both the Takings Clause of the Fifth Amendment and the First Amendment.  We review the district court's grant of summary judgment to the government de novo.  *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020).  We agree with Valancourt that Section 407's demand for physical copies of works, as applied by the Copyright Office here, represents an uncompensated taking of private property under the Takings Clause.  We need not reach Valancourt's First Amendment claim, as it seeks the same relief through that challenge.

A.

Under the Takings Clause of the Fifth Amendment, the government has a "clear and categorical obligation" to provide just compensation if it "physically acquires private property for a public use." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  A physical appropriation of property presents the "clearest sort of taking," *id.* (quoting *Palazzolo v. Rhode Island*, 553 U.S. 606, 617 (2001)), which we assess "using a simple, *per se* rule:  The government must pay for what it takes," *id.*  Although the Takings Clause often arises in the context of real property, its requirements apply to personal property as well:  "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015).

By requiring copyright owners to provide physical copies of books, the mandatory deposit provision "effect[s] a 'classic taking in which the government directly appropriates private property for its own use.'" *Tyler v. Hennepin Cnty.*, 143 S. Ct.

14

1369, 1376 (2023) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). When copyright owners deposit copies of works with the Library of Congress, they "lose the entire 'bundle' of property rights" in the relinquished copies, including "the rights to possess, use and dispose of" them. *Horne*, 576 U.S. at 361–62 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). A government demand to turn over personal property is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *See id.* at 362 (quoting *Loretto*, 458 U.S. at 432).

A demand for personal property would not be a taking, however, if it involved a voluntary exchange for a governmental benefit. If the property owner is "aware of the conditions" of an exchange, and if the conditions are "rationally related to a legitimate Government interest," presenting the exchange poses no takings problem. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984). In *Monsanto*, accordingly, the Court held that the Environmental Protection Agency could validly condition registration of pesticides on the disclosure of relevant trade secrets (a form of property) because the disclosure requirement could be justified as a condition on a "valuable Government benefit." *See id.* By consenting to the agency's requirements for a license, Monsanto demonstrated that it was "willing to bear [the] burden" of disclosing trade secrets "in exchange for the ability to market pesticides." *Id.*

A voluntary exchange for a benefit like the one in *Monsanto* does not exist, however, if the purported "benefit" is illusory. In *Horne v. Department of Agriculture*, the Supreme Court considered a regulation that required raisin growers to give a percentage of their crop to the government as part of the government's efforts to maintain an orderly raisin market. 576

15

U.S. at 354–55. Distinguishing *Monsanto*, the Court concluded that the raisin provision effected a taking because the raisin growers received no "special governmental benefit" in exchange for forfeiting their raisins. *Id.* at 366. True, the growers received the right to "[s]ell[] produce in interstate commerce." *Id.* But unlike the "license to sell dangerous chemicals" granted in *Monsanto*, the right to sell produce was a "basic and familiar use[] of property" that the growers already enjoyed and were entitled to exercise. *Id.*

Here, as in *Horne*, copyright owners receive no additional benefit for the works they forfeit pursuant to Section 407's deposit requirement. Mandatory deposit is not required to secure the benefits of copyright. Copyright first "subsists" when an author "fix[es]" a work "in any tangible medium of expression." 17 U.S.C. § 102(a). So, when a writer puts words on a page, that work gains copyright; when an artist paints on a canvas, that work gains copyright. Copyright thus is "both instant and automatic," in that it "vests as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020). Authors need not take any affirmative step to obtain copyright: it attaches immediately upon fixation of the work.

Nor is mandatory deposit required to continue retaining copyright and its benefits. The mandatory deposit statute authorizes the Copyright Office to make a demand for copies in writing. If a copyright owner fails to make the required deposit within three months of such a demand, the statute stipulates that the owner will be liable for a range of fines: "a fine of not more than $250 for each work," a payment equal to the "total retail price" of the demanded works, and an additional fine of $2,500 if the copyright owner "willfully or repeatedly fails or refuses to comply with" a demand. 17

16

U.S.C. § 407(d). While copyright owners are subject to a series of fines for failure to deposit, they retain copyright regardless of whether they pay the fines. Indeed, the statute itself declares that the deposit requirement is not a "condition[] of copyright protection," providing perhaps the clearest sign that mandatory deposit is unrelated to retaining copyright. *Id.* § 407(a).

In urging us to view mandatory deposit as part of a voluntary exchange, the government cites the many benefits that copyright confers upon authors. But authors obtain those benefits upon fixation, and mandatory deposit grants no additional benefits. Tellingly, the government cannot point to a single incremental benefit that copyright owners receive for depositing works pursuant to Section 407. That provision then cannot represent a voluntary exchange for a benefit—there is no benefit at all.

In that respect, the difference between Sections 407 and 408 is illuminating. Unlike with Section 407, authors receive additional benefits if they deposit their works along with an application and filing fee pursuant to Section 408, the statutory provision governing copyright registration. *See id.* § 408. Notably, registration is a precondition to bringing an infringement action. *Id.* § 411(a). Registration can also provide copyright owners with prima facie evidence of the validity of their copyright, *id.* § 410(c), and access to additional remedies if they prevail in an infringement suit, *id.* § 412.

The government does not get any further by asserting that copyright is a governmental benefit. We agree that copyright is not a natural right. Rather, it is a uniquely governmental benefit whose conferral the Copyright Office can validly condition on meeting various requirements. *See Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663–64 (1834) ("No one can deny that when the legislature are about to vest an exclusive right in

17

an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed . . . .").  But mandatory deposit under Section 407 bears no relationship to that benefit, and the governmental nature of the benefit does not change that fact.

A review of the mandatory deposit provision's history shows how Section 407 became a burden untethered to any benefit.  For many years, the benefits of copyright were intimately tied to mandatory deposit, and authors had to deposit works to either obtain or maintain copyright and its related benefits.  The first copyright legislation required authors to "deposit a printed copy" of their work to gain the benefit of copyright.  Copyright Act of 1790, ch. 15, § 3, 1 Stat. 124, 125.  The Copyright Act of 1909 then eliminated mandatory deposit as a requirement to gain copyright protection, instead conferring copyright upon publication of a work with a copyright notice.  *See* Copyright Act of 1909, Pub. L. No. 60-349, § 9, 35 Stat. 1075, 1077.  But mandatory deposit remained necessary to maintain copyright:  if the author failed to "promptly" deposit two copies of the work after receiving a demand from the Copyright Office, the copyright would "become void" and the author would incur a fine.  *Id.* §§ 12–13, 35 Stat. at 1078.

Subsequent legislative developments eroded the quid pro quo nature of mandatory deposit.  The Copyright Act of 1976 made copyright automatic upon fixation of a work in a tangible medium, and that regime persists today, meaning mandatory deposit remains unnecessary to gain copyright.  *See* Copyright Act of 1976, Pub. L. No. 94-553, § 102(a), 90 Stat. 2541, 2544–45.  The Act also removed loss of copyright as a sanction for failure to deposit, meaning mandatory deposit also became unnecessary to maintain copyright.  *See id.* § 407(d), 90 Stat. at 2579.

18

In 1988, Congress again amended the copyright regime, this time to comply with the Berne Convention for the Protection of Literary and Artistic Works, which prohibits its members from conditioning copyright on "any formality." Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised at Stockholm on July 14, 1967, art. 6(2), 828 U.N.T.S. 221, 233. Congress complied by eliminating an author's obligation to include a copyright notice when publishing his works to retain copyright, further disentangling copyright protection from the actions an author takes after obtaining it. *See* Berne Convention Implementation Act of 1988, Pub L. No. 100-568, § 7, 102 Stat. 2853, 2857. While the government relies on a Ninth Circuit decision that upheld the mandatory deposit requirement against constitutional challenges, that decision considered a prior version of the statute, before the 1988 amendments. *See Ladd v. Law & Tech. Press*, 762 F.2d 809 (9th Cir. 1985).

Those statutory changes brought us to the present-day version of Section 407, whose obligations are triggered upon publication but whose fulfillment provides no marginal benefit to copyright owners. Valancourt does not dispute that prior versions of the statute suffered no infirmity under the Takings Clause. That is because mandatory deposit was long related either to gaining or to maintaining the benefits of copyright, making it part of the price of federal copyright protection. While works copyrighted before the Copyright Act of 1976 went into effect are still governed by the preexisting regime, no such copyrights are at issue in this case. *See* Copyright Act of 1976, Transitional and Supplementary Provisions § 110, 90 Stat. at 2600. Valancourt's copyrights all fall under the current copyright regime, which lacks the quid pro quo that characterized previous versions of the statute.

19

The government suggests it is counterintuitive to determine that statutory changes making it easier to secure and maintain copyright protection had the effect of rendering mandatory deposit unconstitutional. But the relevant issue is not the magnitude of the burden placed on authors to obtain copyright. Rather, the key point is that the changes to copyright law untethered the deposit requirement from the benefits of copyright protection, erasing copyright's status as the product of a voluntary exchange akin to the one blessed in *Monsanto*.

It is true that copyright owners can satisfy Section 407 by paying a fine instead of forfeiting their property. But the government understandably does not contend that the "option" of paying a fine affects the analysis. A statute can effect a taking even if the property owner never actually forfeits property and is instead subject to a fine. In *Horne*, the government assessed a fine of $480,000 and an additional civil penalty of over $200,000 when the Hornes refused to give up their raisins, and the Hornes brought suit when the government tried to enforce the fine. 576 U.S. at 356. In that sense, the Hornes were able to avoid giving over their raisins if they instead chose to incur a fine. But the Court held that the raisin reserve requirement effected a taking even though the only action the government took was to impose a "fine and associated civil penalty . . . when [the Hornes] resisted the Government's effort to take their raisins." *Id.* at 370.

Just as the alternative of a fine in *Horne* did not save the statute from constituting a taking, Section 407's scheme of fines does not save the statute here, either. A "demand for money" that "operate[s] upon . . . an identified property interest" can violate the Takings Clause because a "monetary obligation burden[s]" ownership of property. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 613 (2013)

20

(quoting *E. Enters. v. Apfel*, 524 U.S. 498, 540 (1998) (Kennedy, J., concurring in the judgment and dissenting in part)). Were we to find otherwise, the government could avoid the strictures of the Takings Clause by purporting to "simply give the owner a choice of either surrendering [property] or making a payment equal to the [property's] value." *Id.* at 612. Thus, "when the government commands the relinquishment of funds linked to a specific, identifiable property interest" such as a piece of personal property, the "'*per se* [takings] approach' is the proper mode of analysis." *See id.* at 614 (alteration in original) (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003)).

### B.

Seeking to characterize Section 407 as part of a voluntary exchange, the government contends that a copyright owner can readily disavow copyright protection and thereby avoid the deposit requirement. By refraining from disavowing copyright protection, the government argues, copyright owners like Valancourt effectively consent to mandatory deposit. *See* Gov't Br. 39–41. We disagree.

If there were a simple, seamless, and transparent way to opt out of copyright protection, perhaps mandatory deposit would fall outside the realm of the Takings Clause because any forfeiture of property might arguably be voluntary. For example, the Supreme Court recently explained that even when the government keeps excess proceeds from a foreclosure sale beyond the amount a property owner owes the government, no Takings Clause violation occurs if the government provides a "process through which the owner [can] claim the surplus." *Tyler*, 143 S. Ct. at 1379 (citing and discussing *Nelson v. City of New York*, 352 U.S. 103 (1956)). The availability of such a process means the government has not "absolutely preclud[ed]

21

an owner from obtaining" the surplus. *Id.* (quoting *Nelson*, 352 U.S. at 110). Here, then, a known and costless option by which to abandon a copyright could be argued to provide copyright owners with a comparable way to avoid having their property unlawfully taken. While the copyright laws have evolved to make it much easier for people to gain copyright in their works, nothing in the current statutes appears to preclude optional abandonment of that right.

We need not resolve whether a known and costless abandonment option would make Section 407 constitutional, however, because there is no indication that an option of that sort generally exists. For an abandonment option to render deposit under Section 407 a voluntary choice, the option would have to at least be cognizable to copyright owners. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . ."); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 773 (D.C. Cir. 2022) (the government must "make the requirements of the law public and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply" (internal quotation marks and citation omitted)). As it stands, however, no statute, regulation, or guidance suggests that an author can readily disavow copyright protection and thereby avoid the associated mandatory deposit requirement.

Expecting copyright owners to somehow glean the existence of an unadvertised abandonment option and subjecting them to demands on their property when they unsurprisingly do not exercise the option "impermissibly burden[s] the right not to have property taken without just compensation." *See Koontz*, 570 U.S. at 607. Short of mining the filings in this case—and somehow knowing of the need to

22

do so—copyright owners would have no way to learn about the ostensibly seamless abandonment option the government now posits. And Valancourt, which of course did not have the filings in this case when it brought its action, had no way of knowing about that option before it sued.

The statute itself gives no indication of any abandonment option or how to effectuate it. Nothing in Section 407's terms would suggest to a copyright owner that she can avoid its requirements by informing the Copyright Office that she would prefer to abandon her copyright rather than deposit copies of copyrighted works. Rather, the statute states that a copyright owner "shall" make a deposit and prescribes fines for failing to comply with a deposit demand from the Copyright Office. 17 U.S.C. § 407(a), (d). The statute then makes clear that mandatory deposit is not a "condition[] of copyright protection." *Id.* § 407(a). To deduce that one could avoid mandatory deposit by disavowing copyright protection would require a copyright owner to infer essentially the opposite of what the statute states. Nothing elsewhere in the copyright statute suggests that owners can abandon their copyright to avoid deposit, either. Copyright "subsists" as soon as one "fixe[s]" a work "in any tangible medium," and it generally lasts from the creation of the work through "the life of the author and 70 years after the author's death." *Id.* §§ 102(a), 302(a).

Nor is there any indication that, in practice, the Copyright Office informs copyright owners of an abandonment option when issuing demands to enforce Section 407. To the contrary, in its first communication to Valancourt, the Office explained that Valancourt had to deposit one copy of each of the 341 listed works on the pain of fines. It did not suggest at any point that Valancourt could avoid the deposit requirement by simply disavowing its copyrights, much less explain how Valancourt

23

could exercise that option in a way that would lead the Office to withdraw its demand for copies of Valancourt's copyrighted works.

If anything, the Copyright Office's demand letter implied that Valancourt was obligated to deposit regardless of any voluntary action it took, as the letter stated that the "obligation to deposit published works under copyright protection exists regardless of whether copyright registration is sought." Letter from Michael Lind, Copyright Off. Acquisitions Specialist, to James Jenkins (June 11, 2018), J.A. 130. The Office also did not mention what the government now says is a readily realizable abandonment option even when Valancourt expressed that it could not afford the costs of mandatory deposit. Instead, the Office renewed its demand and explained that the 240 works it had identified at that point were "copyrightable materials subject to Copyright Mandatory request/demand." E-mail from Angela Coles, Copyright Off. Acquisitions Assistant, to James Jenkins (Aug. 9, 2018), J.A. 137.

The Copyright Office's own guidance requires copyright owners to pay a $125 fee to register a notice of abandonment. That guidance further diminishes any possibility of an owner's gaining the impression that there might be some costless abandonment option readily realizable through—as the Office now suggests—a simple communication to the Office. The Office's Compendium, an administrative manual it publishes, states that copyright owners must mail a document and the "appropriate filing fee" to the Office to record an abandonment. U.S. Copyright Off., Compendium of U.S. Copyright Office Practices § 2311 (3d ed. 2021), https://copyright.gov/comp3/chap2300/ch2300-recordation.pdf [https://perma.cc/669W-5KUR] (last visited Aug. 12, 2023). The Office's table of fees then stipulates that

24

the base fee for recording a paper document, including a notice of termination, is $125. *Fees*, U.S. Copyright Off., https://www.copyright.gov/about/fees.html [https://perma.cc/7DNH-UEYH] (last visited Aug. 12, 2023). It would appear to someone reviewing the Office's Compendium, then, that the only way to officially abandon copyright entails the payment of a significant fee. While the government now represents that the fee applies to recordation of abandonment and not abandonment itself, there is no indication in the Compendium or any other available source that a costless abandonment option exists. When the only reference to an abandonment option is one carrying a $125 fee, copyright owners are unlikely to think they could easily abandon copyright (and its attendant obligations like Section 407's deposit obligation) without cost.

The government represents that copyright owners in fact can abandon copyright simply by taking any overt action indicating an intent to surrender copyright protection, regardless of whether they pay $125 to record a notice of abandonment. The government points to a line of decisions in which courts have recognized abandonment through an overt action as an affirmative defense to claims of copyright infringement. *See* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.06 (Matthew Bender rev. ed.) (describing the defense of abandonment of copyright). But the government does not explain why copyright owners would know of such a judicially created doctrine developed in the context of infringement litigation, much less why even knowledgeable copyright owners would think that abandonment in that context would be effective to avoid Section 407's deposit requirement. Indeed, the government itself suggested at oral argument that abandonment for one purpose would not necessarily work for another, as it represented that the version of copyright abandonment it now

25

posits would suffice to avoid Section 407's demand
requirement might not be effective to defend against
infringement claims.  Oral Arg. 29:11–29:59.

In the end, the only affirmative indication of a costless
abandonment option is in the government's statements in this
litigation.  The government first referenced such an option in
its summary judgment briefing, in which it represented that
Valancourt and other copyright owners could escape their
Section 407 deposit obligation by informing the Copyright
Office of their wish to abandon copyright.  *See* Mem. in Supp.
of Defs.' Mot. for Summ. J. at 22, *Valancourt Books*, 554 F.
Supp. 3d 26, No. 18-cv-1922.  It repeated that representation in
our court.  *See* Gov't Br. 39–41.  But representations made only
in the course of litigation—and appearing in no statute,
regulation, or guidance—do not demonstrate that an
abandonment option was in fact cognizable to copyright
owners like Valancourt.  *Cf. Rhea Lana, Inc. v. Dep't of Lab.*,
824 F.3d 1023, 1030–31 (D.C. Cir. 2016) (explaining that
deference to an agency's interpretation of its own regulation is
unwarranted "when it appears that the interpretation is nothing
more than a convenient litigating position, or a *post hoc*
rationalization advanced by an agency seeking to defend past
agency action against attack" (quoting *Christopher v.
SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012));
*Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012)
(concluding in the Section 1983 context that "[a] mere legal
position, without anything more, is insufficient to constitute an
official policy").

The government also asserted at oral argument that
Valancourt should have recognized that copyright (and its
attendant obligations), like any other property right, can be
waived.  *See* Oral Arg. 21:51–22:21.  But it is telling that even
the government did not frame its argument that way in its

26

briefing in the district court or our court. Instead, it characterized abandonment of copyright as a principle specific to copyright law rather than a broad truism of property law, suggesting that such a principle is not so obviously applicable in this context. And Section 407's language and the Copyright Office's public materials would indicate to a copyright owner that such a principle does not apply here. Multiple amici accordingly contend that a costless and seamless abandonment option is unapparent to the public, as they characterize the abandonment option as illusory. *See* Ass'n of Am. Publishers Amicus Br. 12–14; Niskanen Ctr. Amicus Br. 6–13; Rosen & Frye Amicus Br. 31–32.

Had the government wanted to make clear that copyright owners could avoid readily mandatory deposit by abandoning their copyright, it knew how to do so, as evidenced by other provisions in the Copyright Act and their corresponding regulations. For example, the Act subjects copyrighted works imported in violation of certain provisions to seizure and forfeiture. *See* 17 U.S.C. §§ 602(a)(1)–(3), 603(c). One can avoid forfeiting the relevant works, however, by providing evidence that "a statement of abandonment has been filed and recorded in the Copyright Office by the copyright owner in accordance with the procedures of the Copyright Office," among other requirements. 19 C.F.R. § 133.51(b)(3)(i). As one court recognized, that regulation exempts "work[s] for which copyright protection is not claimed" from certain importation restrictions. *Authors League of Am., Inc. v. Oman*, 790 F.2d 220, 221 (2d Cir. 1986). By codifying formal abandonment of copyright as a mechanism to render certain legal obligations inapplicable, the import regulation illustrates how the government could communicate the availability of a copyright abandonment option along with the option's implications for the mandatory deposit requirement. The government, though, has not issued any such guidance.

27

The government lastly argues that Valancourt consented to the burdens of Section 407 by choosing to place copyright notices on its works. But just as Valancourt did not consent to mandatory deposit by refusing to disavow its copyrights, it did not consent by including copyright notices in its works. Nothing in the statute or the accompanying regulations suggests that a copyright owner agrees to deposit two copies of a work by using copyright notices. Although inclusion of a copyright notice bore legal relevance in prior versions of the statute, the statute now states that the mandatory deposit requirement is triggered by mere "publication" of a work. 17 U.S.C. § 407(a).

The government thus cannot infer consent from Valancourt's actions—either from its refraining from exercising an ostensibly costless abandonment option of which there is no evidence of Valancourt's knowledge, or from its affixing a notice of copyright to its works without any indication that doing so somehow amounted to consenting to relinquish its property. Rather, in the circumstances, the Copyright Office's enforcement of Section 407 against Valancourt worked an unconstitutional taking of property.

Our decision, as we have explained, is tied to the particular circumstances: circumstances in which the Copyright Office enforced Section 407 by issuing a demand letter indicating no option other than surrendering the property at issue or paying a fine, and in which Valancourt had no indication from any other source of the existence of a costless option to disavow copyright protection and thereby avoid complying with the sole options described in the demand letter. We leave it to the district court and the parties to fashion relief commensurate with the parameters of our resolution.

28

Because we conclude that the way the Copyright Office enforced Section 407 against Valancourt works a taking, we need not reach Valancourt's challenge under the First Amendment. Valancourt has not argued that the scope of relief it seeks differs with respect to its First and Fifth Amendment claims, and we are unaware of any reason to think that would be the case. Were we to consider Valancourt's First Amendment claim, our analysis would proceed in much the same fashion, as we would determine whether, on the facts of this case, the Copyright Office's enforcement of Section 407 against Valancourt runs afoul of the First Amendment. Indeed, Valancourt acknowledged at oral argument that, as it relates to physical copies, its claims under the Fifth and First Amendments work in the same manner. *See* Oral Arg. 13:58–15:50.

\*    \*    \*    \*    \*

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions to grant summary judgment to Valancourt consistent with our opinion.

*So ordered.*